IT IS HEREBY ADJUDGED and
DECREED this is SO ORDERED.

Dated: September 29, 2012

*Smtr/Maren Curley*

Sarah S. Curley, Bankruptcy Judge
_____

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| In re RICHARD CHAD DAY and DEBORAH J. DAY, | Chapter 7 <br><br> Case No. 10-bk-41537-SSC <br><br> Adv. No. 11-ap-00529-SSC <br> (Not for Publication- Electronic Docketing ONLY) |
| CLARENCE J. SMITH TESTAMENTARY TRUST, <br><br> Plaintiff, <br><br> v. <br><br> RICHARD CHAD DAY and DEBORAH J. DAY, <br><br> Defendants. | MEMORANDUM DECISION |

## I. INTRODUCTION

The Clarence J. Smith Testamentary Trust, the Plaintiff, filed its Complaint against the Debtors, Deborah and Richard Day on March 23, 2011. In the Complaint, the Plaintiff alleged a number of grounds that it believed supported a judgment that the debt due and owing to the Plaintiff by the Debtors should be non-dischargeable. The Debtors filed an Answer on April 25, 2011. A number of pretrial hearings were subsequently conducted in the

1

adversary, and the issues presented were scheduled for trial. On July 24, 2012, the Court held the trial, and thereafter, this matter was deemed under advisement.

This Decision shall constitute the Court's findings of fact and conclusions of law pursuant to Fed. R. Civ. P. 52, Bankruptcy Rule 7052. The Court has jurisdiction over this matter, and this is a core proceeding. 28 U.S.C. §§ 1334 and 157 (West 2012).

## II.  UNCONTESTED FACTS

1. Debtors filed a petition for relief under Chapter 7 of the Bankruptcy Code on December 30, 2010.

2. Plaintiff is a Trust duly established in 1982 and existing under the laws of Arizona (the "Trust"). At all times material herein, Clarence James Smith, Jr. ("CJ") was the Trustee of the Trust.

3. On March 25, 2009, Terri Lynn Langford, M.D., and Jamie Jo Smith Cantara were appointed as Co-Successor Trustees of the Trust.

4. At all times material herein, the Trust was the owner of the real property located at 2005 N. 103rd Avenue, Avondale, Arizona 85323. The property consisted of approximately 20 acres and had been developed as a film studio facility (the real property and improvements are hereinafter referred to as the "Studio").

5. Prior to November 2005, the Studio was managed by C.J.S. Film Studios, Inc., an Arizona corporation, wholly owned and operated by CJ.

6. Prior to November 2005, Richard Chad Day ("Day") and Raymond Ellingsen ("Ellingsen") approached CJ with a proposal to reorganize the Studio by obtaining investment capital from third parties totaling $11,000,000.00.

7. In early November 2005, Day, Ellingsen, and CJ met with Charles Berry, a securities lawyer, to discuss the securities implications of the proposal and the mechanics of soliciting investment capital.

2

8. Hollywood-Phoenix Film Studios, LLC ("Hollywood-Phoenix") was formed in December 2005 as an Arizona limited liability company for the purpose of developing, expanding, improving, and operating the Studio.

9. The Members of Hollywood-Phoenix were Ellingsen (45%), CJ (45%), and Day (10%).

10. Day took over the office manager duties for Hollywood-Phoenix beginning in January 2006.

11. The Debtors were the sole shareholders of GIFD Corporation ("GIFD"), and Day was its sole officer and director.

12. Subsequently, Day's duties were set forth in a written agreement between Hollywood-Phoenix and GIFD, which included providing consulting services for the Studio.

13. In early 2006, it became evident to Day that Hollywood-Phoenix was not going to be able to secure the investment capital needed to achieve the goals for the Studio initially contemplated by Day, Ellingsen, and CJ.

14. On March 9, 2006, Day executed a brokerage agreement with KoBay Financial Corp. authorizing KoBay to obtain a mortgage loan to be secured by the Studio.

15. The sole purpose of obtaining a loan was to provide operating and development monies for the Studio.

16. Victor Hall of KoBay introduced Day to Emile Auguste of Castleview Home Loans.

17. Day conducted all discussions with Emile Auguste relative to a loan for the Studio.

18. In June, 2006, Ellingsen's relationship with the Studio was terminated and CJ, then 79 years of age, entrusted the entire operation and management of the Studio to Day.

19. On July 24, 2006, a $3,000,000.00 loan from Pure Capital Development, LLC

3

to the Trust was funded and closed (the "Loan").

20. The Loan was evidenced by a Promissory Note and secured by a first lien Deed of Trust on the Studio. The Additional Facts, as presented at trial, reflect that Arizona Film Studios was to be the recipient of at least $100,000.00 of the Loan Proceeds as required start-up capital. Arizona Film Studios did not exist as the time of the funding of the Loan.

21. The net proceeds of the Loan, namely $2,564,831.29, were wire transferred into Washington Mutual Account No. 366-683000-1, which account was in the name of GIFD and controlled by Day (the "Loan Proceeds Account").

22. The handwritten information appearing on the Wiring Instructions to Investors Title Company dated July 18, 2006, which directed the wire transfer of the Loan proceeds, was made by Day.

23. Day implemented a Quick Books Accounting System to record all accounting transactions for GIFD, Hollywood-Phoenix, and Arizona Film Studios beginning January 1, 2006.

24. The GIFD Balance Sheet Detail as of December 31, 2007, was prepared by Day and reflects all accounting transactions from January 1, 2006, through December 31, 2007, for GIFD.

25. Day caused check register spreadsheets to be generated from the Quick Books system, which reflected all deposits and withdrawals to and from the Loan Proceeds Account from June 14, 2006, through May 24, 2007.

26. Day controlled all of the deposits to and withdrawals from the Loan Proceeds Account.

27. On July 26, 2006, Day withdrew $100,000.00 from the Loan Proceeds Account (the "AFSI Withdrawal").

28. The AFSI Withdrawal was not deposited into any account maintained by

4

Hollywood-Phoenix or Arizona Film Studios, Inc.

29. There is no evidence in the records maintained by Day that Hollywood-Phoenix, Arizona Film Studios, Inc., or Plaintiff received the AFSI Withdrawal or any benefit from the AFSI Withdrawal.

30. On July 27, 2006, Day caused $170,000.00 to be withdrawn from the Loan Proceeds Account (the "Rodriguez Withdrawal").

31. The proceeds from the Rodriguez Withdrawal were loaned by GIFD to Javier Rodriguez to enable him to purchase a single-family residence at 4546 E. Bowker Street, Phoenix, Arizona 85040 on July 28, 2006.

32. The $170,000.00 loan to Mr. Rodriguez was secured by a Deed of Trust reflecting GIFD as the beneficiary.

33. The $170,000.00 loan to Mr. Rodriguez was repaid on September 29, 2006.

34. The proceeds from the loan to Mr. Rodriguez, namely, $173,145.00 (principal and interest), were deposited into the Loan Proceeds Account on October 12, 2006.

35. The Studio received a benefit of $3,145.00 as a result of the Rodriguez Withdrawal.

36. The Rodriguez Withdrawal represented a short-term high interest rate loan intended to generate interest income for the Studio utilizing Loan proceeds that would otherwise remain dormant in the Loan Proceeds Account.

37. On August 7, 2006, Day withdrew $750,000.00 from the Loan Proceeds Account and remitted to Emile Auguste dba Castleview (the "Castleview Withdrawal").

38. Day never discussed the Castleview Withdrawal with CJ.

39. Prior to the Castleview Withdrawal, Day discussed with Emile Auguste Mr. Auguste's plan to take Castleview public in eight to twelve months.

40. Prior to the Castleview Withdrawal, Day's due diligence consisted of

5

researching the website regarding Castleview.

41. Day released the Castleview Withdrawal to Emile Auguste to enable Mr. Auguste to take Castleview public, at which time Day understood that Castleview would repay the Castleview Withdrawal and issue twenty percent of its stock to some party as, apparently, directed by Day.

42. There were no written documents evidencing any agreement with Castleview regarding the use or repayment of the Castleview Withdrawal.

43. The Castleview Withdrawal was never returned or repaid to Hollywood-Phoenix, Arizona Film Studios, Inc., or Plaintiff.

44. The Studio received no benefit from the Castleview Withdrawal.

45. On August 18, 2006, Day caused $170,398.65 to be withdrawn from the Loan Proceeds Account (the "67th Avenue Withdrawal").

46. Day made the 67th Avenue Withdrawal to enable GIFD to purchase the residential real property located at 4545 N. 67th Avenue, Phoenix, Arizona 85033 (the "67th Avenue House") on August 21, 2006.

47. On August 21, 2006, GIFD owned the 67th Avenue House free and clear of any monetary liens.

48. Day contemplated making some improvements to the 67th Avenue House and reselling it within a couple of months at a profit.

49. GIFD borrowed $75,000.00 against the 67th Avenue House on February 26, 2007.

50. The proceeds from the February 26, 2007, loan against the 67th Avenue House were not remitted to Plaintiff, Hollywood-Phoenix, or Arizona Film Studios, Inc.

51. The proceeds from the February 26, 2007, loan were deposited into GIFD's Washington Mutual Account No. 095-3561224 on February 26, 2007.

6

52. GIFD borrowed $135,000.00 against the 67th Avenue House on March 19, 2007 and used a portion of those loan proceeds to pay off the previous $75,000.00 loan.

53. The proceeds from the $135,000.00 against the 67th Avenue House were not remitted to Plaintiff, Hollywood-Phoenix, or Arizona Film Studios, Inc.

54. On April 2, 2007, GIFD borrowed $40,275.00 against the 67th Avenue House.

55. The proceeds from the April 2, 2007 loan against the 67th Avenue House were not remitted to Plaintiff, Hollywood-Phoenix, or Arizona Film Studios, Inc.

56. None of the proceeds from the $135,000.00 and $40,275.00 loans against the 67th Avenue House were returned to Plaintiff, Hollywood-Phoenix, or Arizona Film Studios, Inc. or used for Studio purposes.

57. On November 16, 2007, GIFD paid off the $42,275.00 loan against the 67th Avenue House and conveyed title to the house through a Deed in Lieu of Foreclosure to the holder of the $135,000.00 loan.

58. The Studio received no benefit from the 67th Avenue Withdrawal.

59. On September 7, 2006, Day caused $139,157.00 to be withdrawn from the Loan Proceeds Account (the "Unexplained Withdrawal").

60. Day recorded the Unexplained Withdrawal as a Bad Debt Expense on the balance sheet of GIFD reflecting the transactions in the Loan Proceeds Account.

61. The proceeds from the Unexplained Withdrawal were not remitted to Plaintiff, Hollywood-Phoenix, or Arizona Film Studios, Inc.

62. The Studio received no benefit from the Unexplained Withdrawal.

63. On September 22, 2006, Day caused $100,000.00 to be withdrawn from the Loan Proceeds Account (the "Durrant Withdrawal").

64. The proceeds from the Durrant Withdrawal were loaned by GIFD to Douglas Durrant to enable Mr. Durrant to purchase a condominium located at 2520 E. University Drive,

7

No. 105, Tempe, Arizona 85281 on September 28, 2006.

65. Day's accountant loaned an additional $40,000.00 to Mr. Durrant to enable Mr. Durrant to purchase the condominium.

66. The joint loan of $140,000.00 to Mr. Durrant was secured by a Deed of Trust, which reflected GIFD and PFS Tax & Financial Services, Inc., as beneficiaries.

67. Day recorded the Durrant Withdrawal as a loan to Hollywood-Phoenix on the GIFD Balance Sheet reflecting the transactions in the Loan Proceeds Account.

68. The proceeds from the Durrant Withdrawal were not remitted to Hollywood-Phoenix.

69. The joint loan of $140,000.00 to Mr. Durrant was repaid on May 23, 2007, and GIFD received the $100,000.00 it had loaned Mr. Durrant from the Durrant Withdrawal.

70. Day never caused the $100,000.00 from the Durrant Withdrawal to be returned or repaid to Plaintiff, Hollywood-Phoenix, or Arizona Film Studios, Inc.

71. The Studio received no benefit from the Durrant Withdrawal.

72. On September 27, 2006, Day caused $40,000.00 to be withdrawn from the Loan Proceeds Account (the "Calhoun Withdrawal").

73. The proceeds from the Calhoun Withdrawal were loaned to Norman Calhoun to enable Mr. Calhoun to purchase a single-family residence at 8701 East Kilarea Avenue, Mesa, Arizona 85029, on September 29, 2006.

74. The $40,000.00 loan to Mr. Calhoun was secured by a Deed of Trust, which reflected Day as the beneficiary.

75. The $40,000.00 loan to Mr. Calhoun was repaid to Day on January 16, 2007.

76. The proceeds of the Calhoun Withdrawal were never remitted, returned, or repaid to Plaintiff, Hollywood-Phoenix, or Arizona Film Studios, Inc.

77. The Studio received no benefit from the Calhoun Withdrawal.

8

78. On October 12, 2006, Day caused $35,000.00 to be withdrawn from the Loan Proceeds Account (the "Diaz Withdrawal").

79. The proceeds from the Diaz Withdrawal were loaned to Francisco Diaz to enable Mr. Diaz to purchase a single-family residence at 1656 West Campo Bello, Phoenix Arizona, on October 13, 2006.

80. The $35,000.00 loan to Mr. Diaz was secured by a Deed of Trust as to which GIFD was one of four beneficiaries.

81. The $35,000.00 loan to Mr. Diaz was repaid to GIFD on July 19, 2007.

82. The proceeds of the Diaz Withdrawal were never remitted, returned, or repaid to Plaintiff, Hollywood-Phoenix, or Arizona Film Studios, Inc.

83. The Studio received no benefit from the Diaz Withdrawal.

84. On October 12, 2006, Day caused $65,000.00 to be withdrawn from the Loan Proceeds Account (the "Burdge Withdrawal").

85. The proceeds from the Burdge Withdrawal were loaned to Ryan Burdge to enable him to purchase a single-family residence at 1787 E. Erie Street, Gilbert, Arizona 85295, on October 16, 2006.

86. The loan to Mr. Burdge was secured by a Deed of Trust, which secured an indebtedness of $100,000.00 on which GIFD and Day's accountant were shown as beneficiaries.

87. The $65,000.00 loan to Mr. Burdge was repaid to GIFD on May 23, 2007.

88. The proceeds of the Burdge Withdrawal were never remitted, returned, or repaid to Plaintiff, Hollywood-Phoenix, or Arizona Film Studios, Inc.

89. The Studio received no benefit from the Burdge Withdrawal.

### III. ADDITIONAL FACTS DETERMINED AT TRIAL

At the trial, Day testified that he attended the Air Force Academy from approximately 1991 to 1993, and that he graduated from Arizona State University in 1996, with

a major in mathematics.    From 1996 to 2005, he worked as an office manager, with expertise in the administrative and technical areas.

Day stated that he formed GIFD in 2003, and he and his wife were the sole shareholders.    GIFD focuses on business development and engineering.

In 2005, Day developed an interest in investing in the film industry.    However, he was not successful, with Day estimating that he lost between $7,500.00 to $12,000.00 in 2005.

In the summer of 2005, Day testified that he first met Ellingsen, who apparently had a plan for the Studio, which was then filming television commercials and "spots."    Day stated that he had no idea as to whether Ellingsen was successful in the film industry. Nevertheless, Day met with Ellingsen and CJ, on several occasions, concerning plans for the Studio.    Day also conceded that he met with a securities lawyer, Charles Berry, in November 2005, concerning a private placement offering to be provided to investors to fund a film company.    The Studio was to be transformed into a place to film "in-house" films and operate a film studio.[1]    In contemplation of having new investors, Ellingsen, CJ, and Day formed Hollywood-Phoenix, and opened four bank accounts.[2]    Day testified that he was the signatory on, and managed, all of the bank accounts.

On March 21, 2006, Day, on behalf of GIFD, and CJ on behalf of Hollywood-Phoenix, entered into an independent contractor agreement ("Agreement").[3]    GIFD was to provide "expertise in providing business consulting and management services."[4]    The Agreement provided that GIFD "shall work diligently and with best efforts to promote the

---

1 Exhibit 3 is the offering memorandum prepared for investors.    It stated how the Studio was to be operated, and how the investment capital was to be utilized.
2 Exhibits 7, 8, 9, and 10.   One account was an operating account, another, a payroll account, a third, a merchant account.
3 Exhibit 18.
4 Id. at ¶ B, Bate Stamp CJS:00306.

10

greatest benefit for Hollywood-Phoenix as to enhance the good will, business, profits and reputation of Hollywood-Phoenix. [GIFD] hereby agrees to designate its president, [Day] as [GIFD's] representative to provide the Consulting Services [GIFD's] obligations to Hollywood-Phoenix as required under this Agreement."[5] Day's entity was an independent contractor, and had the sole and exclusive right to determine how the services were to be provided, subject to the consulting services described in Exhibit B to the Agreement.[6] Of importance is the fact that the Agreement provided that Day, the designated individual, and GIFD were to manage the "financial activities of Hollywood-Phoenix including the creation and maintenance of budgets, management of accounts receivable and accounts payable," and all other day-to-day "financial activities of Hollywood-Phoenix."[7] The initial term of the Agreement was from April 1, 2006, through December 31, 2011.[8] GIFD was to receive compensation of $8,333.33 per month for the initial term of the Agreement.[9] Pursuant to the Agreement, Day performed his duties as the designated person for GIFD.

Day conceded that the investment capital that was raised was limited. The sum of $465,000 in investment capital was raised as a result of the private placement memorandum. Day conceded at trial that commencing in March 2006, he entered into a series of transactions to obtain loans to finance the operations of Hollywood-Phoenix and the Studio.

In July 2006, CJ obtained the Loan for the Trust in the amount of $3,000,000.00 to assist with the funding of Hollywood-Phoenix and the Studio. The Note had an adjustable

---

5 Id. at ¶ 1.
6 Id. at Exhibit B to the Agreement. In reviewing the services, GIFD and Day were to manage the operation of the Studio, which included maintaining the property, buildings, and equipment managing, and coordinating the leasing of the production facilities, sound states, and other facilities; managing and overseeing the on-site museum and film school operations; overseeing the marketing department; managing the employees and independent contractors of Hollywood-Phoenix.
7 Id. at Exhibit B, Bate Stamp, CJS: 00312.
8 Id. at ¶ 3, Bate Stamp CJS: 00307.
9 Id. at ¶ 4. GIFD was also to receive additional compensation predicated on 10 percent of the adjusted gross profits of Hollywood-Phoenix during the term of the Agreement.

11

interest rate, and the Trust was required to place a Deed of Trust on the Studio to secure repayment of the Note.[10]  At the time, the Loan required a principal and interest payment of over $31,000.00 per month.  The settlement statement for the Loan reflected that the Trust only received $2,554,696.27 of the Loan Proceeds, since an origination fee and a consulting fee had to be paid to close the loan.[11]  Because Ellingsen and CJ had had a "falling out," the Loan proceeds were placed in the GIFD account (Loan Proceeds Account) solely under Day's control.[12]  As outlined more completely under the Uncontested Facts, Day then engaged in a series of transactions with the Loan Proceeds placed in the Loan Proceeds Account during 2006.

Day also testified that Arizona Film Studios was to receive around $100,000.00 as start-up capital for its operations as a part of the business plan of Hollywood-Phoenix. However, when the Loan was obtained by the Trust and was funded in July 2006, Arizona Film Studios had not yet been formed as a corporation.  Day stated that he did not know what happened to the funding for the Arizona Film Studios.[13]  Ultimately Arizona Film Studios took over the Hollywood-Phoenix operations, but it is unclear what money Arizona Film Studios used to operate.

On July 28, 2006, Day caused in excess of $170,000.00 to be withdrawn from the Loan Proceeds Account to commence a series of transactions that could only be described as speculating in the Arizona real estate market.  Although Day testified that he discussed with CJ using the Loan Proceeds for short-term loans to obtain higher interest rates as an investment vehicle for Hollywood-Phoenix, the Studio, and perhaps Arizona Film Studios, Day's testimony was not credible.  CJ had obtained a substantial amount of money, through his Trust, to keep

---

10 Exhibits 30 and 31.
11 Exhibits 37 and 26.  The fees paid to Castleview should have been only $60,000.00 not the $120,000.00 paid by the Trust.
12 Exhibit 29.
13 Exhibits 56, 57, and 58 reflect the forming of Arizona Film Studios as a corporation, but the bank accounts for the entity do not reflect funds from the Loan Proceeds Account being placed with Arizona Film Studios.

12

the Studio operating.    The Loan was secured by a Deed of Trust on the Studio.    There is simply no credible evidence that CJ would suddenly place funds that were to save his Studio into high-risk real estate loans that were to be provided to individual consumers that he did not know. Moreover, the evidence reflects that Day had little experience in, and had no sophisticated knowledge about, real estate investing.[14]    Why would CJ agree to have the Loan Proceeds placed with Day who had no experience in real estate investing?    The Court concludes that Day simply appropriated the Loan Proceeds Account as his own, for his investing purposes.    He may have hoped to cover any losses sustained by the Studio from its operations by investing in a speculative and volatile real estate market, but that did not happen.

Of equal concern to the Court was Day's testimony that on August 7, 2006, Day withdrew $750,000.00 from the Loan Proceeds Account, with Castleview as the payee.[15]    The same Castleview that overcharged the Trust for fees related to the obtainment of the $3,000,000 Loan by the Trust.    Day testified that he provided the sum of $750,000.00 to Castleview, controlled by Auguste, "to take Castleview public."    Again, Day's actions are patently inconsistent with the purpose of the Loan obtained by the Trust.    Why would CJ and the Trust place a substantial portion of their funds with an entity that had nothing to do with Hollywood-Phoenix, the Studio, or Arizona Film Studios?    Moreover, Day testified that he knew nothing about Castleview or Auguste.    Day had only looked at the company's website to determine that $750,000.00 should be taken from the Loan Proceeds Account and given to Castleview.    Day hoped that the $750,000.00 loan would be repaid when Castleview went public, and that the promised 20 percent stake in Castleview, as a public company, would pay off the $3,000,000.00 Note on the Studio.    Did Day have anything in writing?    No.    Did Day review an offering memorandum?    No.    Did Day do any due diligence concerning the

---

14 Day testified that he had previously invested in real estate, but other than the transactions described at trial, Day provided no evidence that he had an expertise in and understood the real estate market.
15 Exhibit 38.

transaction? No. But Day was "sincerely" sorry that all of the money was lost. Day used words to the effect that "he was surprised as anyone that all of the money had been lost." Day also conceded that the sum of $120,000 in fees was paid to him or his entity when the $750,000.00 loan was given to Castleview.

Day's testimony lacks credibility, since Day also testified that he majored in mathematics and touted his expertise in providing financial services to companies. Moreover, Day could provide little evidence as to how Hollywood-Phoenix, the Studio, or Arizona Film Studios derived any benefit from the speculative investments that Day engineered.[16] Although Day believed that some of the Loan Proceeds had been utilized to pay employees at the Studio or as upkeep or maintenance on the Studio, the bank accounts over which Day had control reflected no such payments.

Day's response to all of this seems to be that he did invest in a number of real estate matters, essentially "flipping"[17] real estate, but he did not benefit from the transactions, so he should not be held responsible. First, Hollywood-Phoenix was paying compensation to Day, which was listed as in excess of $8,000.00 per month in the Agreement, while he used the entity's funding from the Loan Proceeds Account as if it were his own. He also used the withdrawals to obtain property or loans for his investment purposes. He acquired the 67th Avenue House with a withdrawal from the Loan Proceeds Account in the amount of $170,398.65. The House was, thus, purchased for cash. He subsequently obtained a $135,000.00 loan and a $40,275.00 loan on the same House. Thus, he certainly had access to substantial Loan Proceeds as to which he cannot explain the disposition.

In short, a summary was presented of all of the withdrawals from the Loan Proceeds Account over which Day had control. The sum of $1,399,555.00 was withdrawn from

---

16 *See* Uncontested Fact No. 35 reflecting a $3,145 benefit to the Studio from the Rodriguez Withdrawal.
17 In 2006, many individuals purchased real property, with 100 percent financing, remodeled the properties, and then sold them within a short-period of time. This practice was described as "flipping."

the Account, and none of the funds were returned to Hollywood-Phoenix or the Studio, except as indicated by Uncontested Fact No. 35.[18]   Day is also not sure what happened to the $100,000 that was supposed to be transferred to Arizona Film Studios as its start-up capital.

At one point in his testimony, Day stated that he did all of his consulting work through his corporation, GIFD, and that it was GIFD that managed the operations of the Studio. To be clear, Day and his wife were the sole shareholders of GIFD, Day had control of the accounts, including the Loan Proceeds Account, and the Agreement specifically designated Day as the individual who was the critical person to provide services to Hollywood-Phoenix and the Studio.

Ms. Langford, CJ's eldest daughter, testified as to her father's state of mind during this time period.   Her father had built a Mexican village and studio on 20 acres of property west of Phoenix.   She stated that over the years, her father had acquired over 5,000 costumes, and a prop room with 10,000 pieces.   CJ had wanted to develop his dream of a film studio.   CJ had also established a museum on the property which included many unique, antique carriages.   In May, 2006, CJ advised Ms. Langford that the initial capital contributions had been insufficient and that Day had told CJ that a loan was necessary to operate the Studio.   By the holidays, 2006, CJ told Ms. Langford that at least one-half of the museum carriages had been destroyed because they had been left in the Arizona sun.   Day was supposed to have maintained the Studio and the museum, and he had failed.   CJ also advised Ms. Langford that he was not receiving financial information from Day and that he had requested the information from Day many times.   Ms. Langford stated that her father had been a certified public accountant, so he would have asked for financial information periodically and would have asked for information as to how funds from the Loan Proceeds Account were being utilized and how Hollywood-Phoenix and the Studio were operating generally.   CJ showed Ms. Langford the financial information

_____

18 Exhibit 83.

that he had received from Day, which CJ described as woefully insufficient.    Ms. Langford also reviewed the information provided, agreed that was insufficient, and encouraged her father to press for more information from Day.    By January 2007, CJ was upset with the loss of funds and the continuing loss from operations of Hollywood-Phoenix and the Studio.    CJ ultimately determined to terminate the services of Day and GIFD.

Gary Carnicle testified that in 2007, he initially looked at the Studio on behalf of C.J., and found the 20 acres to be in a state of disarray.    Unknown individuals unconnected with the Studio or the museum apparently occupied the property.    Mr. Carnicle testified that he saw individuals removing Studio property with no authorization.    Mr. Carnicle stated that as many as six businesses received their mail at the Studio.    Mr. Carnicle also testified that the property had not been maintained, that the real estate taxes had not been paid for quite some time, and that he had had to utilize his personal credit card to keep the electricity turned on at the property. He reviewed the documents prepared by Day and given to CJ at the end of 2006.    He described the information prepared by Day as "fluff."    Mr. Carnicle also stated that when he reviewed the financial information that he had received, it appeared that there was very little left of the net amount of $2,564,831.29 provided as a Loan by the Trust.    CJ gave Mr. Carnicle his power of attorney to run the operations of Hollywood-Phoenix and the Studio, and Mr. Carnicle determined that Day and his company would be discharged.    Mr. Carnicle did finally receive the accounting records maintained by Day after numerous requests.[19]

Mr. Carnicle stated that he reviewed the Castleview loan transaction whereby Day transferred $750,000.00 from the Loan Proceeds Account to Castleview, so that Castleview would have funds to proceed with a public offering.    Mr. Carnicle stated that he asked Day about the transaction, and Day provided inconsistent information to him.    Mr. Carnicle

---

19  Because of the expense to perform a forensic audit or accounting, Mr. Carnicle testified that the accounting records turned over by Day were never accessed by Mr. Carnicle.

separately contacted Castleview, and when he stated that he would provide his information to the Securities and Exchange Commission and the Nevada Attorney General, he received a May 14, 2007 stock certificate from Castleview for at least a portion of the funds previously transferred from the Loan Proceeds Account. However, Mr. Carnicle was unable to recover any money as a result of having the stock certificate transferred to him. Mr. Carnicle stated that when he described the Castleview transaction, CJ stated that he had no knowledge of the transaction. In further discussions with Day in 2007, Day offered to "provide title" to four properties that Day owned as a means to repay any obligation that he might owe to the Trust. Mr. Carnicle stated that he asked a real estate broker to review the properties offered. However, the real estate market in Arizona was rapidly declining in value and entering a recession. Mr. Carnicle, acting for the Trust and based upon the recommendation of the real estate broker, declined the properties offered by Day and demanded that the Trust be paid in cash. He stated that Day did make two cash payments to the Trust, although he could not recall the precise amount paid. By January 2008, the Studio and its operations were rapidly running out of money, and Mr. Carnicle asked the Smith family to release him from his duties. Mr. Carnicle had managed the Studio from March 2007 to January 2008.

In March 2008, Day and his wife filed a chapter 7 bankruptcy petition.


IV. DISCUSSION

The Plaintiff requests that its debt be excepted from discharge pursuant to 11 U.S.C. §§ 523(a)(2), (4), and (6). The Court will review each ground, seriatim, to determine whether relief should be granted.


A. DISCHARGE UNDER § 523(a)(2)

Pursuant to 11 U.S.C. § 523(a)(2)(A), a monetary debt is nondischargeable "to the

extent obtained by false pretenses, a false representation, or actual fraud."    In the Ninth Circuit, to prove nondischargeablity under § 523(a)(2)(A), the Plaintiff needs to show "(1) that the debtor made the representations; (2) that at the time he knew they were false; (3) that he made them with the intention and purpose of deceiving the creditor; (4) that the creditor justifiably relied on such representations; and (5) that the creditor sustained alleged loss and damage as the proximate result of such representations." In re Diamond, 285 F.3d 822, 827 (9th Cir. 2002);    In re Ettell, 188 F.3d 1141, 1144 (9th Cir. 1999); In re Eashai, 87 F.3d 1082, 1086 (9th Cir. 1996); See also In re Sabban, 384 B.R. 1 (9th Cir. BAP 2008). The Plaintiff must establish the nondischargeability of a debt by a preponderance of the evidence. Grogan v. Garner, 498 U.S. 279, 284, 111 S.Ct. 654 (1991).

For a debt to be excepted from discharge, the debtor must actually intend to defraud the creditor.    In re Tsurukawa, 258 B.R. 192, 198 (9th Cir. BAP 2001).    However, direct evidence of an intent to deceive is rarely shown.    Hence, intent may be "inferred and established from the surrounding circumstances." In re Hultquist, 101 B.R. 180, 183 (9th Cir. BAP 1989); In re Anastas, 94 F.3d 1280, 1285086 (9th Cir. 1996); In re Dakota, 284 B.R. 711, 721 (Bankr. N.D. Cal. 2002).    The court must consider whether the totality of the circumstances paints a picture of deceptive conduct by the debtor that indicates an intent to deceive the creditor. In re Basham, 106 B.R. 453, 457 (Bankr. E.D. Va. 1989). Because no single objective factor is dispositive, the assessment of intent is, thus, left to the fact-finder.    In re Jacks, 266 B.R. 728, 742 (9th Cir. BAP 2001).    The intent to defraud a creditor is a finding of fact.    In re Rubin, 875 F.2d 755, 759 (9th Cir. 1989).

No doubt the facts of this case are unfortunate, however, the evidence is not sufficient for the Court to find a basis for liability under Section 523(a)(2)(A). The Plaintiff failed to present sufficient evidence demonstrating that Day made false representations with the intent to defraud.

18

Moreover, of critical importance is Plaintiff's failure to show evidence of justifiable reliance. CJ was a certified public accountant who was familiar with accounting records. He also had the ability to sever relationships with business partners when appropriate. For instance, although he had known Ellingsen for a substantial period of time, the evidence reflects that when Ellingsen did not provide the necessary capital, through a private placement memorandum, for Hollywood-Phoenix and the Studio, CJ terminated Ellingsen's interest in the project, obtained a Loan through CJ's Trust, and placed the Loan Proceeds in the Loan Proceeds Account to preclude Ellingsen's access to any further funds.

The Court must determine justifiable reliance based upon the sophistication of the parties. Thus, an individual with relatively little sophistication may justifiably rely on the false representations of a debtor, and not be required to perform an extensive background investigation. In re Kirsh, 973 F.2d 1454 (9th Cir. 1992) (The Court can take into account the knowledge and relationship of the parties themselves.) However, given CJ's level of sophistication, particularly in financial matters, it would be expected that he would have done some due diligence concerning the employment of GIFD, with Day as the designated individual. No evidence was presented on this critical element. Since the Plaintiff bears the burden of proof on this prong and no evidence has been shown concerning this point, the Court must deny the claim for relief under Section 523(a)(2)(A).


B. DISCHARGE UNDER § 523(a)(4)

1. FRAUD OR DEFALCATION WHILE ACTING IN A FIDUCIARY DUTY

Section 523(a)(4) provides that an individual debtor is not discharged from any debt "for fraud or defalcation while acting in a fiduciary capacity, embezzlement or larceny." In the Ninth Circuit, to prevail on a complaint under this Subsection, the creditor must establish

19

three elements: (1) an express trust;[20] (2) that the debt was caused by fraud or defalcation; and (3) that the debtor was a fiduciary to the creditor at the time the debt was created. In re Jacks, 266 B.R. 728 (9th Cir. BAP 2001); In re Bigelow, 271 B.R. 178 (9th Cir. BAP 2001).

The question of whether a fiduciary relationship exists for purposes of Section 523(a)(4) is one of federal law. In re Cantrell, 329 F.3d 1119, 1125 (9th Cir. 2003); Ragsdale v. Haller, 780 F.2d 794, 795 (9th Cir. 1986). When determining the fiduciary relationship issue, the courts should consult state law. Id. The broad-based, general definition of fiduciary is not applicable in the context of an exception to discharge under Section 523(a)(4). In re Lewis, 97 F.3d 1182, 1185 (9th Cir. 1996). Not all fiduciary capacities or relationships recognized by state law will be found sufficient for Section 523(a)(4) purposes. Cantrell at 1125-26.

Under Section 523(a)(4), the Ninth Circuit requires that a debtor must have been a trustee, in the strict or narrow sense, through an express or technical trust. Banks v. Gill Distribution Centers, Inc., 263 F.3d 862 (9th Cir. 2001). Whether a fiduciary is the trustee of an express trust depends on state law, and an express trust may be imposed by common law. In re Lewis, 97 F.3d 1182, 1185-86 (9th Cir. 1996) (holding that Arizona case law imposes an express trust on partners). A general fiduciary duty of confidence, trust, loyalty, and good faith is insufficient to establish a relationship for purposes of nondischargeability. In re Tallant, 207 B.R. 923 (Bankr. E.D. Cal. 1997) *aff'd* in part, *rev'd* in part on other grounds, 218 B.R. 58 (9th Cir. BAP 1998); In re Young, 91 F.3d 1367 (10th Cir. 1996).

A defalcation has been defined as a misappropriation of trust funds or money held in any fiduciary capacity, or the failure to account properly for such funds. In re Hemmeter, 242 F.3d 1186 (9th Cir. 2001); In re Lewis, 97 F.3d 1182 (9th Cir. 1996); In re Baird, 114 B.R. 198

---

20 The express trust must be created prior to, and separate from, any alleged wrongdoing. See In re Lewis, 97 F.3d 1182 (9th Cir. 1996)(citing Ragsdale v. Haller, 780 F.2d 795 (9th Cir. 1986)("[T]he fiduciary relationship must be one arising from an express or technical trust imposed before and without reference to the wrongdoing that caused the debt.))

(9th Cir. BAP 1990).

One of the landmark cases on this issue is the Ninth Circuit decision of <u>F.D.I.C. v. Jackson</u>, 133 F.3d 694 (9th Cir. 1998). In <u>Jackson</u>, the Ninth Circuit held that a debtor need not have the intent to commit a fraudulent act to be denied a discharge under Section 523(a)(4). <u>Id.</u> at 703. "[D]efalcation, at least for the purposes of nondischargeability under Section 523(a)(4), includes any behavior by a fiduciary, including innocent, negligent and intentional defaults of fiduciary duty. . . ." Thus, even innocent acts of failure to account fully for money received in trust will be held as nondischargeable defalcations; no intent to defraud is required. <u>Id.</u>; *See also* <u>In re Short</u>, 818 F.2d 693 (9th Cir. 1987); <u>In re Baird</u>, 114 B.R. 198 (9th Cir. BAP 1990).

In this matter, the Plaintiff had the burden of proof to show that Arizona law created some type of express trust prior to any defalcation by Day. Day was certainly a member of Hollywood-Phoenix, an Arizona limited liability company.[21] However, there is no specific provision of Arizona law which creates a fiduciary duty between the members of a limited liability company. For a state statute to create an express or technical trust relationship for nondischargeability purposes, the statute must define the trust res, spell out the trustee's fiduciary duties, and impose a trust prior to and without reference to the wrong which created the debt. <u>In re Baird</u>, 114 B.R. 198 (9th Cir. BAP 1990). The Arizona Limited Liability Act is silent on the fiduciary duties of members and does not define any trust res. A.R.S. § 29-681; <u>In re Johnson</u>, 2008 WL 5071756 (Bankr. D. Ariz. 2008). Unfortunately, given the Court's inability to find that some express trust was created prior to any defalcation by Day, the Court must deny relief under the fiduciary capacity element of Section 523(a)(4).

2. EMBEZZLEMENT

Embezzlement in the context of nondischargeability has often been defined as "the fraudulent appropriation of property by a person to whom such property has been entrusted

---

21 <u>See</u> Uncontested Fact Nos. 8 and 9.

or into whose hands it has lawfully come." <u>Moore v. United States</u>, 160 U.S. 268, 269 (1885). Thus, for nondischargeability purposes under Section 523(a)(4), embezzlement requires three elements: "(1) property rightfully in the possession of a nonowner; (2) nonowner's appropriation of the property to a use other than which [it] was entrusted; and (3) circumstances indicating fraud. <u>In re Littleton</u>, 942 F.2d 551 (9th Cir. 1991); <u>In re Wada</u>, 201 B.R. 572 (9th Cir. 1997). "Circumstances indicating fraud" can be situations where the debtor intended to conceal the misappropriation. <u>In re Hatch</u>, 465 B.R. 479 (Bankr. W.D. Mich. 2012). Embezzlement does not require the existence of a fiduciary relationship. <u>In re Wada</u>, 201 B.R. 572 (9th Cir. 1997).

   The Plaintiff has set forth a sufficient basis under an embezzlement theory to be accorded relief.    CJ obtained a loan through his Trust, in the net amount of $2,554,696.27, which he entrusted to Day, because CJ no longer trusted Ellingsen, and CJ had terminated Ellingsen's interest in Hollywood-Phoenix.    The facts reflect that CJ relied on Day to use the Loan Proceeds to operate Hollywood-Phoenix and the Studio.    Day was the designated individual to act on behalf of Hollywood-Phoenix, even though the Agreement had been entered into between Hollywood-Phoenix and GIFD, Day's entity.    The Loan Proceeds were entrusted to GIFD, and Day, the designated individual, to be used for the operations of Hollywood-Phoenix and the Studio.    These funds were placed in the Loan Proceeds Account at GIFD, over which Day had complete control.    Thus, the first prong of the test has been met.

   The facts reflect that soon after GIFD and Day received the Loan Proceeds, Day engaged in a series of unauthorized transactions which consisted primarily of speculative investments in the Arizona real estate market.    These transactions included (1) the 67th Avenue Withdrawal, and the subsequent encumbering of the 67th Avenue House, which led to two loans in the approximate amount of $135,000.00 and $40,000.00, being secured by the House by Day, which loans were never repaid, with the House eventually being transferred by Day to the first lienholder on the property to extinguish the debt in the amount of $135,000.00; (2) the

22

$139,157.00 Unexplained Withdrawal; (3) the net amount of $100,000.00 from the Durrant Withdrawal; (4) the $40,000.00 Calhoun Withdrawal, (5) the $35,000.00 Diaz Withdrawal, and (6) the $65,000.00 Burdge Withdrawal.   Neither Hollywood-Phoenix nor the Studio received any benefit from these Withdrawals.   The only real estate transaction which provided any benefit to Hollywood-Phoenix or the Studio was the Rodriguez Withdrawal, which provided a paltry benefit of $3,145.00.   Day also orchestrated the $100,000.00 AFSI Withdrawal constituting funds that were to be placed with the Arizona Film Studio, Inc., for its start-up capital, which never occurred.   As to the Castleview Loan, Day withdrew $750,000.00 from the Loan Proceeds Account and loaned the funds to Castleview to assist with a proposed public offering of stock.   However, Day neither prepared nor obtained any documentation concerning this loan; he did no due diligence; and he received a fee which he kept in the amount of $120,000.   These facts clearly show a misappropriation of funds that were entrusted to Day. At no point in time did CJ, the critical, controlling member of Hollywood-Phoenix and the Studio, with a 90 percent membership interest after Ellingsen left, authorize any of the aforesaid transactions.   The Loan Proceeds Account was to be utilized to continue the operations of Hollywood-Phoenix and the Studio, including the museum.   The second prong of the test has been met.

Day's failure to provide financial information to CJ when requested and Day's obfuscation of the speculative real estate transactions and loans in which he was engaged indicate that Day was engaged in some type of fraudulent activity.   It is rare that any individual will admit fraud.   Thus, the Court must review the circumstances of the case to determine the nature of the transaction.   Day's behavior, as reflected in the facts of this case, is so inconsistent with his duties and responsibilities to manage and operate Hollywood-Phoenix and the Studio, the businesses of which were a film and television studio and a museum, that the Court concludes that Day engaged in fraudulent activity, which he tried to cover up for quite some

time.    The third prong of the test has been met.    The Court calculates the damages incurred by the Trust which provided the Loan Proceeds to be as follows:

> 67th Avenue Withdrawal--$170,398.65
>
> The Unexplained Withdrawal--$139,157.00
>
> The Durrant Withdrawal--$100,000.00
>
> The Calhoun Withdrawal--$40,000.00
>
> The Diaz Withdrawal--$35,000.00
>
> The Burdge Withdrawal--$65,000.00
>
> The AFSI Withdrawal--$100,000.00
>
> The Castleview Loan--$750,000.00
>
> Total:    $1,399, 555.65
>
> Minus:    $      3,145.00
>
> Net:      $1,396,410.65

The Court recognizes that the 67th Avenue transaction included a series of steps which makes it somewhat difficult to calculate the damages.    The Court begins with Day's initial withdrawal of $170,398.65 to purchase the 67th Avenue House free and clear of any encumbrances.    Day then encumbered the 67th Avenue House with a loan in the amount $75,000.00, then $135,000.00 (which repaid part of the $75,000.00 loan in some undetermined amount), and a loan in the amount of $40,275.00.    However, Day repaid the $40,275.00 loan, with interest, for the aggregate amount of $42,275.00.    Because of declining real estate values, Day then transferred the House to the first lienholder, by quit claim deed, to extinguish the remaining debt of $135,000.    Thus, if one views the effect of the transaction vis a vis the Trust, Hollywood-Phoenix, and the Studio, Day essentially lost the $170,398.65 that was withdrawn from the Loan Proceeds Account.    The Trust, Hollywood-Phoenix, and the Studio were not liable on any of the other obligations that Day incurred.    However, said parties did lose the

opportunity to invest the sum of $170,398.65, in an appropriate manner, and then utilize those funds for the operations of the Studio. Because of Day's actions, those funds were no longer available, and Hollywood-Phoenix and the Studio received no benefit therefrom.

The other problematic area from a loss calculation stand-point is the withdrawal concerning Castleview. CJ did not authorize the $750,000.00 Loan, and Day did not do any due diligence concerning the loan transaction. Day did benefit from the transaction through the receipt of $120,000.00 in fees. However, the loss by Hollywood-Phoenix and the Studio is the access to the $750,000.00, and any benefit that may have been derived from those funds. When Day misappropriated the funds derived from the Castleview Loan, he became responsible for the full repayment of said Loan.

The Court has also provided Day with the benefit of the Rodriguez Withdrawal in the sense that $3,145 was turned over to Hollywood-Phoenix and the Studio as a result of that transaction. No loss was incurred by the parties as a result of that transaction.

As to the findings that the debtors have committed embezzlement and that damages necessarily result therefrom, the decision of <u>King v. Lough (In re Lough),</u> 422 B.R. 727 (Bankr. D. Id. 2010) provides some guidance. In <u>Lough</u>, the plaintiff intended to move from Idaho to North Carolina and provided the debtors with access to, and permission to sell, certain personal property items owned by the plaintiff. <u>Id</u>. at 735. After the plaintiff moved, the debtors sold the personal property items as requested. However, rather than remitting the funds to the plaintiff at the new location, the debtors kept the funds. <u>Id</u>. The debtors testified that they never intended to misappropriate the funds from the sale of the plaintiff's property. Upon learning that the plaintiff intended to return to Idaho, the debtors acquired replacement personal property for the plaintiff. <u>Id</u>. The Court concluded that the debtors had engaged in embezzlement. The Court stated:

25

> Despite Defendants' testimony that it was never their intention to harm Plaintiff or to deprive him of the money, the fact remains that three months passed without them fulfilling Plaintiff's wishes. Indeed, when asked directly at trial, Defendant Timothy Lough responded that he did not know why Defendants did not give Plaintiff his money. Under these circumstances, the Court declines to believe that Defendants never intended to deprive Plaintiff of these funds. Plaintiff has shown adequate evidence of fraud in this regard.

Id. This Court concludes that the facts of this case are similar to those in Lough. Both Debtors should be held responsible for the embezzlement conducted by Day.

To the extent that the Debtors desire to avoid liability by stating that all of the actions were taken by GIFD, and not them, such a position is inconsistent with the case law. For instance, in the decision of Hodnett v. Loevner (In re Loevner), 167 B.R. 199, 204 (Bankr. E.D. Va. 1994), the "debtor was an officer, director and 50 percent shareholder of a financial planning corporation who controlled the investment of client funds and daily corporate operations." The Court ultimately concluded that the debtor should be held liable for the nondischargeable debt of the corporation, since it was the debtor who made the investment decisions. Id. Although Loevner discusses the nondischargeability of a debt under Section 523(a)(2)(A), a similar analysis may be employed in this case under Section 523(a)(4). Both Debtors were 50 percent shareholders of GIFD, Day was the designated individual to act on behalf of GIFD, Day was the critical officer/director of GIFD, and Day provided any earnings or funds that he received from Hollywood-Phoenix or the Studio to the marital community. In essence, the wrongful conduct of Day benefitted both Debtors to the detriment of the Trust, Hollywood-Phoenix, and the Studio. As such, both Debtors should be held responsible under Section 523(a)(4).

The Court recognizes that the marital relationship alone cannot be utilized to hold a spouse responsible for the other spouse's conduct resulting in a nondischargeable debt. However, a relationship between the spouses which arises from a business relationship is sufficient to support a nondischargeable debt against both spouses. Tsurukawa v. Nikon

Precision (In re Tsurukawa), 287 B.R. 515, 519 (9th Cir. BAP 2002).


## C. DISCHARGE UNDER § 523(a)(6)

      11 U.S.C. § 523(a)(6) prevents discharge from any debt "for willful and malicious injury by the debtor to another entity or the property of another entity."   Banks v. Gill Distribution Centers, Inc., 263 F.3d 862 (9th Cir. 2001).   The Supreme Court held this to require a "deliberate or intentional injury, not merely a deliberate or intentional act which causes injury." Kawaauhau v. Geiger, 523 U.S. 57, 61 (1998).   Moreover, under Lockerby v. Sierra, 535 F.3d 1038 (9th Cir. 2008), the Court must find that the debtor engaged in some form of "tortious conduct."   If the court is able to find such conduct, then the court determines whether the debtor's conduct was both "willful" and "malicious."

      A debtor's actual knowledge is the focus of the willfulness inquiry under Section 523(a)(6). "[T]he subjective standard correctly focuses on the debtor's state of mind and precludes application of § 523(a)(6)'s nondischargeability provision short of the debtor's actual knowledge that harm to the creditor was substantially certain." In re Thiara 285 B.R. 420 (9th Cir. BAP 2002) (citing Su v. Carrillo (In re Su), 259 B.R. 909, 914 (9th Cir. BAP 2001), aff'd, 290 F.3d 1140 (9th Cir. 2002)).   In addition, the injury must be "malicious." This means that it must also be a wrongful act, done intentionally, which necessarily causes injury, and which is done without just cause or excuse. Petralia v. Jercich (In re Jercich), 238 F.3d 1202, 1208 (9th Cir. 2001), cert. denied.

      The tort of conversion requires an act of dominion or control exerted over another's personal property that seriously interferes with the other's right to control the property. Universal Mktg. & Entm't, Inc. v. Bank One of Ariz., 203 Ariz. 266, 268, ¶ 6, 53 P.3d 191, 193 (App. 2002) (citing Restatement (Second) of Torts § 222A(1) (1965); Focal Point, Inc. v. U-Haul Co. of Ariz., 155 Ariz. 318, 319, 746 P.2d 488, 489 (App. 1986).   This tort would apply to a

debtor who wrongfully obtains possession of another's property.    In this case, Day's possession of the Loan Proceeds was not wrongful.    However, Section 523(a)(6) should certainly include a wrongful act such as embezzlement.    Such conduct is the equivalent of some form of "tortious conduct."    Day's actions were also deliberate or intentional, since he had complete control over the Loan Proceeds Account and made the determination as to how to speculate in the real estate market.    Given the nature of the speculative activities that he was engaged in, Day knew that harm to the Trust, Hollywood-Phoenix, and the Studio was substantially certain to occur. Finally, Day's actions were malicious, since he engaged in a wrongful act (embezzlement), which caused injury to the Trust, Hollywood-Phoenix, and the Studio, and Day was unable to provide any just cause or excuse for what he did.    It was his investment in a speculative real estate market, and his obfuscation of those activities, that led to the loss suffered by the Trust.    The Plaintiff has met its burden of proof under Section 523(a)(6).

## V. CONCLUSION

Based upon the foregoing, the Court concludes that the Debtors shall be liable to the Trust in the amount of $1,396,410.65 under Section 523(a)(4) and (a)(6) as a result of the embezzlement by the Debtors of funds that should have been returned to the Trust.    The Court denies any relief to the Trust under Section 523(a)(2)(A).    The Court shall execute a separate order incorporating this Memorandum Decision.

SIGNED AND DATED ABOVE

28